UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.   **DECISION AND ORDER**
     23-CR-59-A

CARLOS JAVIER ALAMO-SORIANO,

                Defendant.

---

Defendant Carlos Javier Alamo-Soriano is charged in a one count Indictment, with abusive sexual conduct, in violation of Title 18, United States Code, Sections 2244(b) and 2246(3).  Dkt. 3. This case was referred to Magistrate Judge H. Kenneth Schroeder, Jr. pursuant to 28 U.S.C. § 636(b)(1) to conduct pretrial proceedings.  Defendant filed a pretrial motion in which he sought, *inter alia*, to suppress certain statements that he made to staff members of the Buffalo Federal Detention Facility ("BFDF") during an investigative interview. Dkt. 38.  On October 16, 2024, Magistrate Judge Schroeder issued a Report, Recommendation and Order "RR&O," which recommended, *inter alia*, that Defendant's motion to suppress his statements be granted.  Dkt. 44.[1]

---

[1] Defendant's pretrial motion also sought dismissal of the indictment based upon Defendant's claim of spoliation of evidence. Dkt. 38, pp. 5-7. The RR&O recommended denial of Defendant's motion to dismiss. Dkt. 44, pp.3-4. As Defendant did not object to such recommendation, and this Court finds no clear error in such recommendation, this Court adopts Magistrate Judge Schroeder's recommendation denying such motion.

The Government filed objections asking this Court to reject the Magistrate Judge's recommendation that Defendant's statements should be suppressed. Dkt. 46. Defendant filed a response in opposition. Dkt. 53. The Government, despite being provided the opportunity to do so, did not file a reply.

Upon *de novo* review the Court determines that the case should be remanded to the Magistrate Judge so that the facts and circumstances surrounding the questioning of Defendant at BFDF may be further developed and, if necessary, a suppression hearing conducted. Specifically, for the reasons which follow, this Court finds that there are insufficient facts before this Court to assess the correctness of Magistrate Judge Schroeder's recommendation on the suppression issue. In so doing, this Court makes the following observations.

Following oral argument on Defendant's motion and without conducting an evidentiary hearing, Magistrate Judge Schroeder, determined that on April 30, 2023, Defendant, who was being held in custody pending removal proceedings against him, allegedly groped a female Contract Detention Officer (hereinafter "Victim 1") at the BFDF. The Magistrate Judge determined that after the incident, the following events took place:

- Defendant was provided with an "Incident Report" that placed him on notice that Victim 1 had filed certain information "regarding her interaction with the defendant" and that "an internal institution disciplinary process was commenced." Dkt. 44, p.3.

- Defendant made the statements that he now seeks to have suppressed as evidence. *Id*.

- Defendant was advised of the following:

  DETAINEE ADVISED OF THE RIGHT TO REMAIN SILENT: YOU ARE ADVISED OF YOUR RIGHT TO REMAIN SILENT AT ALL STAGES OF THE DISCIPLINARY PROCESS BUT ARE INFORMED THAT YOUR SILENCE MAY BE USED TO DRAW AN ADVERSE INFERENCE AGAINST YOU AT ANY STAGE OF THE INSTITUTION DISCIPLINARY PROCESS. YOU ARE ALSO INFORMED THAT YOUR SILENCE ALONE MAY NOT BE USED TO SUPPORT A FINDING THAT YOU HAVE COMMITTED A PROHIBITED ACT. *Id*. at 5.

- Defendant was sent to a Special Housing Unit ("SHU") and a "Prison Rape Elimination Act ("PREA") investigation was conducted. *Id*. at 3.

- Defendant was interrogated as part of the "PREA" investigation and allegedly admitted that he had groped Victim 1. *Id*.[2]

Significantly, however, aside from the foregoing, the RR&O does not contain any factual findings regarding the circumstances or context in which such events—including both the Defendant's utterance of the statements which the Government now seeks to introduce against him as well as any questioning of Defendant—took

---

[2] The RR&O recommends suppression of Defendant's statements made during both the disciplinary proceeding and the PREA investigation. Dkt. 44, p. 10.  However, although the questioning of Defendant as part of the PREA investigation was apparently distinct from any questioning that was part of the internal institution disciplinary process, the record before this Court fails to establish any of the particulars of either question including, for example, when the questionings took place, who conducted them, where they were conducted, and the circumstances and conditions under which each were conducted, etc.

3

place (in terms of their location, duration, date, time, individuals present, conditions, circumstances, etc.) or even the chronology in which they occurred.  For the reasons which follow, such factual uncertainties preclude this Court from assessing the correctness of the Magistrate Judge's findings and recommendation on the suppression issue.

## DISCUSSION

The Fifth Amendment provides that a person may not "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. That protection encompasses not only a defendant's right to refuse to testify at trial but also a suspect's right "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). But the Fifth Amendment does not bar all Government interrogation designed to elicit self-incriminating statements. The Constitution prohibits only use of statements that are "compelled," that is, "whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer."  *United States v. Jones*, 299 F.3d 103, 110 (2d Cir. 2002).

To determine whether a statement is compelled, the Supreme Court's caselaw requires courts to examine the context in which the statement was given. *See United States v. Ramos*, 685 F.3d 120, 127 (2d Cir. 2012) ("An individual who makes self–incriminating statements without claiming the [Fifth Amendment] privilege is deemed not to have been 'compelled' but to have spoken voluntarily.").

4

Generally, to be protected by the privilege a witness must assert that right specifically. Thus, a witness's answers, "are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of privilege." *Minnesota v. Murphy*, 465 U.S. 427. Further, "if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Id*. (quoting *Garner v. United States*, 424 U.S. 648, 654 (1976)). In general, when the Government questions a suspect, it is incumbent upon the suspect to invoke his Fifth Amendment right to silence. This does not require lawyerly precision, "talismanic phrases[,] or any special combination of words." *See United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996). Depending on the circumstances, simply "refusing to answer questions" may suffice to invoke one's right to silence. *Id*.

Nevertheless, because the Fifth Amendment privilege against self-incrimination is generally <u>not</u> self-executing, *see, Murphy*, 465 U.S. at 425, an individual's failure to assert the privilege during an interview will, in many instances, result in a waiver of such privilege such that the district court may properly deny a motion to suppress the self-incriminating statements made during that interview. *See e.g., United States v. Jennings*, 652 F.3d 290, 305 (2d Cir. 2011) ("because Jennings did not assert his Fifth Amendment privilege in his … interview with [his Probation Officer], the district court properly denied the motion to suppress the self-incriminating statements made during that interview.").

In this case, the record regarding exactly what statements were made by Defendant and the circumstances under which they were made is, at best,

undeveloped. To the extent that the record that does exists suggests that Defendant failed to invoke his right to silence before making the statements which the Government now seeks to use against him in its criminal prosecution of him, Defendant's ability validly to assert the privilege might well depend on whether the circumstances under which the Defendant made his statement or statements fall into one of those situations in which the courts have recognized the privilege against self-incrimination to be self-executing—that is, it need not be affirmatively asserted.

One situation in which the courts have recognized the privilege to be self-executing is the so-called "penalty situation," when the government threatens to penalize a questionee for asserting the right. *Murphy*, 465 U.S. at 434; *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977) ("[A] State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself."). Another situation in which the privilege becomes self-executing is when an individual is subject to a custodial interrogation. "Although Miranda's requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." *Roberts v. United States*, 445 U.S. 552, 560 (1980). The Court will separately consider the application of each of these self-executing privileges to the facts of this case.

### **The Penalty Situation**

One example of a situation in which courts have found the privilege to be self-executing is the so-called "penalty" situation, in which the speaker was pressured to

speak because a penalty would have been imposed if had such speaker asserted the privilege. *See Garrity v. New Jersey*, 385 U.S. 493 (1967) (defendant threatened with loss of employment if he did not respond); *see also United States v. Ramos*, 685 F.3d at 127 ("Where the government compels an individual to speak by threatening him with a substantial penalty for exercising his Fifth Amendment right to remain silent, the privilege is self-executing.").

In *Murphy*, *supra*, the Supreme Court was asked to apply these principles to a person under probation. In that case, probationer had been directed to attend an interview and to respond to a probation officer's questions. The probationer argued that his right to silence was self-executing. On the facts of *Murphy*, the Court rejected that argument. It reasoned that Murphy was like a witness "who is required to appear and give testimony" at trial or in a grand jury. *Id*. at 437. Like such a witness, Murphy might have felt pressure not to invoke his right against self-incrimination, but, like such a witness, it was nonetheless incumbent upon Murphy to invoke his right to silence. The Court limited its holding, however, by noting that if the probation officer had led Murphy to believe that his probation would have been revoked if he refused to answer, then that "would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id*. at 425.

Importantly, the Court, in *Murphy*, found that the probation officer interrogating Murphy did not, "either expressly or by implication, assert[ ] that invocation of the privilege would lead to revocation of probation," *id*. at 425, or any other

7

"impermissible penalty," *id*. at 437. The Court noted that this was true "[w]hether [it] employ[ed] a subjective or an objective test." *Id*. As to Murphy's subjective beliefs, the Court found that "[t]here is no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." *Id*. As to an objective view, the Court held that if Murphy "did harbor a belief that his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not have been reasonable. Our decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id*. at 438.

In *Griffin v. California*, 380 U.S. 609, 614 (1965), the Supreme Court held that a person may not suffer any penalty in a criminal case for exercise of her Fifth Amendment right to silence, and that this prohibition is not restricted to fine or imprisonment but extends to the imposition of any sanction which makes assertion of the Fifth Amendment privilege "costly."

Here, the only "threat" or "cost" communicated to Defendant if he were to invoke his privilege was that his silence may be used to draw an adverse inference against him during the disciplinary process, although he was also advised that his silence alone could not be used to support a finding that he committed some prohibited act.   Dkt. 44, p. 5.   Although not cited by either party or by the Magistrate Judge, the Supreme Court in *Baxter v. Palmigiano*, 425 U.S. 308 (1976), held that drawing an adverse inference from the prisoner's silence in a disciplinary proceeding—which is precisely what the Defendant was warned would happen in this case--did not offend the Fifth Amendment.  Palmigiano, an inmate of a Rhode

Island prison, was charged in a disciplinary proceeding with inciting a disturbance of prison operations.  He, like Defendant here, was warned as part of the disciplinary proceedings against him that he had the right to remain silent but that if he did so his silence would be used against him. Palmigiano remained silent at the hearing and was, as a result, placed in punitive segregation for thirty days. The Supreme Court rejected a constitutional challenge to the Rhode Island procedure, noting that its "conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference when the privilege is claimed by a party to a civil cause.' " *Baxter*, 425 U.S. at 318.

After *Baxter*, there is no longer any doubt that at trial a civil defendant's silence may be used against him, even if that silence is an exercise of his constitutional privilege against self-incrimination.  In *Baxter*, the majority opinion emphasized that a prison inmate in Rhode Island electing to remain silent during his disciplinary hearing could not automatically be found guilty of the infraction with which he had been charged solely as a consequence of his silence. *Baxter*, 425 U.S. at 317-318. Under Rhode Island law, as with the warning provided to the Defendant in this case, an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board.  Advice given to inmates—like the Defendant in this case—by the decisionmakers is merely a "realistic reflection of the evidentiary significance of the choice to remain silent." *Baxter*, 425 U.S. at 318.

On its face then, under *Baxter*, the warnings provided to Defendant—at least in the context of the disciplinary proceeding against him—did not violate his Fifth Amendment rights. Here, as in *Baxter*, *Murphy,* and *Ramos*, Defendant was not advised that that a disciplinary violation would automatically result from his silence. *See*, *Baxter v. Palmigiano*, 425 U.S. at 317–18 (the fact that it was "undisputed that an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board," distinguished Baxter's case from "the *Garrity-Lefkowitz* decisions, where refusal to submit to interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State."); *Minnesota v. Murphy*, 465 U.S. at 425, 438 (concluding that law enforcement officer did not "either expressly or by implication, assert[ ] that invocation of the privilege would lead to revocation of probation," or any other "impermissible penalty"); *United States v Ramos*, 685 F.3d at 128–29 (holding that a possibility that silence "could lead to the initiation of violation proceedings or the revocation of his parole" was insufficient to create a penalty condition)

Instead, the record before this Court establishes that Defendant was expressly told that his "silence alone may not be used to support a finding that he committed a specific act." Dkt. 44, p. 5. As such and without more, there is insufficient evidence on the record before this Court to support any conclusion that the interview (or interviews) of Defendant created a penalty situation in which the Fifth Amendment privilege was self-executing. *Id*.

10

**Miranda**

A second situation in which courts have recognized the privilege against self-incrimination to be self-executing is the one that was asserted by Defendant in his motion to suppress and found by Magistrate Judge Schroeder in his RR&O recommending suppression—that is, that Defendant was subject to a custodial interrogation without being afforded the benefit of his *Miranda* warnings. Dkt. 44, pp. 5-10. As argued by Defendant and found by Judge Schroeder, Defendant was subject to custodial interrogation, which imposes "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 477 (1966).

"To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona,* ruled that police may not interrogate a suspect who has been taken into custody without first" issuing several warnings. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). But for *Miranda* to come into play, the defendant must be subject to "custodial interrogation." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).

Here, while the details remain unknown, the record broadly suggests that Defendant, who apparently did not receive his *Miranda* warnings, was twice subject to questioning—once as part of BFDF's disciplinary process and once as part of a PREA investigation. Yet, the record is devoid of those facts necessary to allow this Court to determine: (1) whether Defendant's statements were in response to

11

"interrogation;" and (2) if they were, whether Defendant was in *Miranda* custody at the time he made them.

First, this Court observes that statements that are volunteered by a suspect are not barred under *Miranda*. *United States v. Familetti*, 878 F.3d 53, 58 (2d Cir. 2017) (quoting *Miranda*, 384 U.S. at 478). Thus, "[a] defendant's volunteered, spontaneous statements are admissible notwithstanding the absence of *Miranda* warnings." *United States v. Smalls*, 719 F. App'x 83, 85 (2d Cir. 2018) (citing *United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970)); *see United States v. Figueroa*, 822 F. App'x 7, 10 (2d Cir. 2020) (affirming denial of motion to suppress post-arrest statements because the defendant made them spontaneously and not "in response to police questioning"). On the record as it presently exists, this Court is unable to determine whether Defendant's statements were spontaneous or were in response to questioning by law enforcement.

Second, this Court observes that determining whether an individual is in custody for purposes of *Miranda* is "an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) (quoting *United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016) and *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)).

Although one who is imprisoned has in one obvious way been deprived of his freedom, and in *Mathis v. United States*, 391 U.S. 1, 4–5 (1968), the Court held that

*Miranda* warnings were required before agents of the Internal Revenue Service could question a prison inmate even on matters unrelated to those for which he was in prison, the mere fact of imprisonment does not mean—as Magistrate Judge Schroeder correctly recognized, *see*, Dkt. 44, pp. 7-8—that all a prisoner's conversations are official interrogations that must be preceded by *Miranda* warnings. Rather, "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, [Courts] must decide whether a [given curtailment of freedom of action] exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) (traffic stop, though it "significantly curtails the 'freedom of action' of the driver and the passengers," *id*. at 436, and is likely viewed by them as compelling continued presence until informed they may leave, *id*., does not so compel a response to questions as to require *Miranda* warnings, *id*. at 437–40).

"When a prisoner is questioned, the determination of custody should focus on all the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. An inmate who is removed from the general prison population for questioning and is thereafter ... subjected to treatment in connection with the interrogation that renders him in custody for practical purposes ... will be entitled to the full panoply of protections prescribed by *Miranda*." *Howes v. Fields*, 565 U.S. 499, 514 (2012)(citations and quotations omitted).

In *Howes*, the prisoner was told at the outset of the interrogation that he could leave at any time, was not physically restrained or threatened, was not uncomfortable, and was offered food and water. *Id.*, at 515. In addition, the interview took place in a well-lit, average-sized conference room, and the door was sometimes left open. *Id*. On the other hand, the prisoner "did not invite the interview or consent to it in advance," nor was he advised "that he was free to decline to speak with the deputies." *Id*. (noting the defendant was not read *Miranda* rights). In addition, the interview lasted for at least five hours in the evening, "and continued well past the hour when [the prisoner] generally went to bed." *Id*. Moreover, the officers who questioned the prisoner were armed, and one of them—according to the prisoner—used "a very sharp tone," and, on one occasion, profanity. *Id*. Finally, because he was incarcerated, the prisoner "was not free to leave the conference room by himself.... Instead, he was escorted to the conference room and, when he ultimately decided to end the interview, he had to wait about 20 minutes for a corrections officer to arrive and escort him to his cell." *Id*.

Based upon the foregoing, and "[t]aking into account all of the circumstances of the questioning—including especially the undisputed fact that [the prisoner] was told that he was free to end the questioning and to return to his cell," the Court concluded that the prisoner was *not* in custody for purposes of *Miranda*. *Id*. at 517.

Once again, in this case, the record is devoid of any of the particulars of the interrogation, such that this Court is unable to determine whether Defendant was at the time he made the statements which the Government now seeks to introduce against him, in fact, subject to custodial interrogation for purposes of *Miranda*.

14

Magistrate Judge Schroeder, relying on the Second Circuit decisions in *United States v Morales*, 834 F.2d 35, 38 (2d Cir. 1987) and *United States v. Rodriguez*, 356 254, 258 (2d Cir. 2004), determined that "[b]y advising the defendant that his silence may be used to draw and inference against him at any step of the institution disciplinary process, which included a PREA investigation, a measure of compulsion above and beyond that inherent in custody itself was created along with psychological pressures that reasonably subjected the defendant to the will of the interrogators. This admonishment created a coercive and compulsory pressure on the defendant to speak in his custodial capacity of an immigration detainee." Dkt. 44, p.9 (citations and quotations omitted). However, as the Second Circuit, has recognized, both *Morales* and *Rodriguez* were subsequently abrogated by the Supreme Court in *Stansbury v. California*, 511 U.S. 318, 323 (1994), which made "clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *See*, *United States v. FNU LNU*, 653 F.3d 144, 152 (2d Cir. 2011) ("significantly, *Morales*, and … this aspect of *Rodriguez*, preceded *Stansbury* and its rejection of subjective intent.*"); see also*, *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011)(adopting an "objective custody analysis" and noting that the "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant.").

Here, this Court finds that the record must be further developed to determine: (1) whether the Defendant's statements were, in fact, in response to interrogation by law enforcement; and (2) if they were, whether the objective circumstances of that

15

interrogation support the determination that Defendant was in custody for purposes of *Miranda*. Magistrate Judge Schroeder's conclusion regarding the impact of law enforcement's decision properly to advise Defendant of his Fifth Amendment right to remain silent in a disciplinary investigation and what the consequences of his decision to do so might be, does not, in this Court's view—standing alone—"smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege. The advice given inmates by the decisionmakers is merely a realistic reflection of the evidentiary significance of the choice to remain silent." *Baxter v. Palmigiano*, 425 U.S. at 318. Rather, the relevant inquiry to be made by this Court is whether Defendant's statements were elicited in response to a custodial interrogation of the Defendant, such that the failure properly to advise him of his *Miranda* warnings render such statements inadmissible at his criminal trial. *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) ("The *Miranda* safeguards apply only to 'custodial interrogations.'"). On the record presently before it, this Court is unable to make that determination.

## **CONCLUSION**

Accordingly, so much of the RR&O as recommended that Defendant's motion to dismiss the indictment should be denied is adopted by this Court as its own, and Defendant's motion to dismiss the indictment is **DENIED**. As to Defendant's motion to suppress his statements, the matter is **REMANDED** back to Magistrate Judge Schroeder for further proceedings consistent with this Decision and Order.

**IT IS SO ORDERED.**

*s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:   March 3, 2025
         Buffalo, New York

17