UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━━━━━━━━━━━━

UNITED STATES OF AMERICA,


      v.                                                                    **DECISION AND ORDER**
                                                  23-CR-59-A

CARLOS JAVIER ALAMO-SORIANO,

                        Defendant.

━━━━━━━━━━━━━━━━━━━━━━━━━━━

## I.      BACKGROUND

Defendant Carlos Javier Alamo-Soriano is charged in a one-count Indictment, with abusive sexual conduct, in violation of Title 18, United States Code, Sections 2244(b) and 2246(3).  ECF #3.[1]  The charge stems from an allegation that Defendant, on April 30, 2023, and while being held in immigration custody at Immigration and Customs Enforcement's (ICE's) Batavia Federal Detention Facility (BFDF) pending removal proceedings against him, *see*, ECF #75, p. 3, groped a female BFDF staff member, who is referred to in the indictment as "Victim 1."

Defendant filed a pretrial motion in which he sought, *inter alia*, to suppress certain statements that he made to three different individuals on April 30 and May 1, 2023, during a disciplinary investigation and a Prison Rape Elimination Act (PREA)

---

[1] References preceded by "ECF" are to docket entries set forth on the electronic case file in this case.  References preceded by "GEX" are to Government Exhibits received into evidence at a suppression hearing which was conducted on April 23, 2025, before the Hon. H. Kenneth Schroeder, Jr. the United States Magistrate Judge to whom this Court referred all pretrial proceedings pursuant to 28 U.S.C. § 636(b)(1).  *See*, ECF #63 (suppression hearing transcript).

investigation which were being conducted in the wake of the incident involving Victim 1. ECF #38, pp. 2-6.  Those statements were: (1) Defendant's statements, during the evening of April 30, 2023, to Lieutenant (Lt.) Caleb Kish, as part of Lt. Kish's disciplinary investigation of the incident; (2)  Defendant's statements, during the morning of May 1, 2023, to Lt. Christian Ange, as part of Lt. Ange's PREA investigation of the incident; and (3) Defendant's statements, during the early-afternoon of May 1, 2023, to Captain (Capt.) Juan Flores, as part of Capt. Flores's Institution Disciplinary Panel (IDP) hearing.[2]

Previously, on October 16, 2024, Judge Schroeder issued a Report, Recommendation, and Order (RR&O) in which he recommended, *inter alia*, that Defendant's motions to suppress his statements be granted. ECF #44. The Government filed objections to that RR&O. *See*, ECF #46.  On March 3, 2025, this Court issued a Decision and Order (D&O) in which it determined that the factual record was insufficient to establish whether Judge Schroeder correctly determined that Defendant's statements should be suppressed on the grounds that his statements were obtained in violation of his Fifth Amendment rights.  ECF #54.[3]  In

---

[2] Defendant's statements to Lt. Kish are memorialized at Paragraph 27 of the Incident Report. *See*, GEX 4, ¶27.  Defendant's statements to Capt. Flores are memorialized at Paragraph 20 of the Incident Report.  *See*, GEX 4, ¶20.  Defendant's statements to LT. Ange are memorialized in: (1) an email which Lieutenant Ange sent to Capt. Flores at 12:07 on May 1, 2023, *see*, GEX 8, pp.2-3; and (2) Section 2 of the SAAPI Assessment Worksheet, *see*, GEX 9.

[3] Judge Schroeder's October 2024 RR&O also recommended that Defendant's motion to dismiss, predicated upon Defendant's claim that the Government's failed to produce a videotape of incident between Defendant and the female BFDF staff member, be denied on the ground that no such videotape ever existed.  ECF #44, pp.3-4. Defendant did not object to such recommendation, and thus, this Court, in its original D&O,

so doing, this Court noted that "[o]n the record presently before it, this Court is unable" to determine "whether Defendant's statements were elicited in response to a custodial interrogation of the Defendant, such that the failure properly to advise him of his *Miranda* warnings rendered such statements inadmissible at his criminal trial." ECF #54, p. 16.  Consequently, this Court remanded the case back to Judge Schroeder "so that the facts and circumstances surrounding the questioning of Defendant at BFDF [could] be further developed and, if necessary, a suppression hearing conducted." ECF #54, p. 2.

On remand, Judge Schroeder conducted a suppression hearing.  ECF #63. Following additional briefing by both Defendant, *see*, ECF #68, and the Government, *see*, ECF#69, Judge Schroeder, on January 29, 2026, filed a second RR&O, which recommended that the Defendant's motion to suppress his statements should be granted.  ECF #75.

The Government again filed objections to Judge Schroeder's second RR&O. ECF #76. Defendant responded, *see*, ECF #80, and the Government replied, *see*, ECF #81.

Although this Court's analysis is slightly different than that set forth by Judge Schroeder in his most recent RR&O, this Court, having reviewed such RR&O, the transcript of the suppression hearing, and the Government's objections, **ADOPTS** the conclusion reached by Judge Schroeder that Defendant's statements to Lt. Kish, Lt. Ange, and Capt. Flores should all be **SUPPRESSED**.

---

adopted Judge Schroeder's recommendation that Defendant's motion to dismiss based upon spoliation of evidence be denied. ECF #54, pp. 1, 16.

## II.    <u>FACTS</u>

At approximately 5:52 p.m. on April 30, 2023, Defendant, who was detained pending removal proceedings, was being escorted to an outdoor recreation yard from the "Alpha-2 Housing Unit" in which he was housed at the BFDF by a female Contract Detention Officer ("CDO") identified in the indictment as Victim 1.  ECF #1. As Victim 1 and Defendant were in a vestibule area between the housing unit and the outdoors and Victim 1 was unlocking the door to the recreation yard, Defendant allegedly groped Victim 1's buttocks as he exited the door. ECF #1, p. 4.  Victim 1 immediately reported this contact to her supervisors, and Defendant was removed from the unit. *Id*.

Thereafter, over the course of the next 18 hours or so, Defendant was interviewed on three distinct occasions by CDOs who worked at BFDF.  While the Court will, as part of its analysis, explain in further detail the specific facts and circumstances under which each of Defendant's statements were obtained, the three interviews at issue on this motion to suppress occurred chronologically as follows:

The first interview of Defendant was conducted on the evening of the incident, by Lt. Caleb Kish, while Defendant was being held in solitary confinement in the Special Housing Unit (SHU) at BFDF.  The avowed purpose of such interview was to further Lt. Kish's disciplinary investigation into Defendant's alleged assault of another officer.  GEX 4, ¶27.

The second interview of Defendant, by Lt. Christian Ange, was conducted on the following morning, May 1, 2023.  The avowed purpose of this interview was that

4

it was part of the PREA investigation which was commenced based on Defendant's claim that Victim 1 grabbed his genitals during the incident.  In furtherance of that PREA investigation, Defendant was transported that morning was from the cell in the SHU in which he was being held to the processing office in which Lt. Ange worked.  While in that processing office, Lt. Ange presumably explained the PREA process to Defendant and had Defendant complete the Sexual Abuse and Assault Prevention and Intervention (SAAPI) assessment worksheet.  During their interaction, Defendant made statements which he now seeks to suppress. *See*, GEX 8 & 9.

The third and final interview at issue is the IDP hearing interview of Defendant, which was conducted by Capt. Flores while inside Defendant's cell during the early afternoon of May 1, 2023.  Such interview occurred after Defendant was returned to his cell in the SHU Unit following his PREA interview and SAAPI assessment.  *See*, GEX 4, ¶20.

## III.   LEGAL STANDARD:

Generally, an individual must invoke his Fifth Amendment right to seek its protection. *Minnesota v. Murphy*, 465 U.S. 420, 429 (1984).  To invoke the Fifth Amendment privilege against self-incrimination, an accused "ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." *Id*. Thus, if an accused voluntarily "chooses to answer," that answer is not privileged. *Id*. There are exceptions, however, to this general rule. *Id*. at 429–41. One exception is the so-called "penalty exception," *see*, *id*. at 434, 439, which applies if the government, "either expressly or by implication, asserts that invocation of the privilege would lead

5

to" punishment. *Id*. at 435.  Another recognized exception, as set forth by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), involves individuals who are subject to a custodial interrogation.  *See, Minnesota v. Murphy*, 465 U.S. at 429-434.

"Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights." *United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016).  Thus, to warrant the conclusion that statements made by a suspect in the absence of *Miranda* warnings ought to be suppressed, a Court must find that such suspect was "[a] interrogated [b] while 'in custody.' " *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998) (citing *Thompson v. Keohane*, 516 U.S. 99, 100-01 (1995)).

"The test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.' " *Faux*, 828 F.3d at 135 (quoting *United States v. Newton*, 369 F.3d 659, 671-672 (2d Cir. 2004)). Although the Court must assess both elements of this objective inquiry, the second—the objective understanding of whether the defendant's freedom was curtailed to a degree associated with a formal arrest—is the " 'ultimate inquiry' because a 'free–to–leave inquiry reveals only whether the person questioned was seized,' " which is a level of restriction distinct from custody. *Id*. (quoting *Newton*, 369 F.3d at 672). Relevant considerations the Court must take into account when making this "ultimate inquiry" include: "(1) the interrogation's duration; (2) its location

6

(*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." *Faux*, 828 F.3d at 135 (quotations omitted) (citing *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011)). Other relevant factors include the "location and atmosphere" of the interrogation, the "language and tone" used by law enforcement officers, and "whether the suspect is searched, frisked, or patted down." *Tankleff*, 135 F.3d at 244.

### IV.    ANALYSIS

The Government objects to Judge Schroeder's RR&O and urges this Court to reject his suppression recommendation because Defendant's statements were not privileged under the Fifth Amendment.  ECF #76, p. 8.  Specifically, the Government's objections, after noting that Defendant failed to involve the privilege prior to making the statements that he did, claim that Judge Schroeder erred in concluding: (1) that Defendant was in a "penalty situation" because he was not threatened with a penalty which compelled him to speak, *id.*, pp. 9-11; and (2) that Defendant was subject to "custodial interrogation" by Lt. Kish, *id.*, pp. 11-15, and Capt. Flores, *id.*, pp. 16-18, during the disciplinary investigations; and by Lt. Ange, during the PREA investigation, *id.*, p. 18.  While this Court agrees with the Government that Judge Schroeder erred in concluding that Defendant was placed in a penalty situation, such that his Fifth Amendment right against self-incrimination was self-executing, this Court agrees with Judge Schroeder that nevertheless all of

Defendant's statements must be suppressed because they were obtained in violation of his *Miranda* rights.

### 1. The Penalty Situation

At the outset, this Court observes that it is undisputed that Defendant never invoked his 5th Amendment rights during any of his interactions with the CDOs at the BFDF.[4]  Because the Fifth Amendment privilege against self-incrimination is generally not self-executing, *see*, *Minnesota v. Murphy*, 465 U.S. at 425,  typically "a witness who desires its protection must claim it." *Salinas v. Texas*, 570 U.S. 178, 181 (2013).  There are limited exceptions to this waiver rule, however, when, for instance, "governmental coercion makes [the defendant's] forfeiture of the privilege involuntary," *Salinas*, 570 U.S. at 184.  One such exception in which the privilege

---

[4] Although not raised by the parties, the Court observes that the three individuals to whom Defendant made the statements which he seeks to suppress were each employed by Akima Global Services a private entity that contracted to provide CDOs to work at BFDF.  *See*, ECF #63, pp. 4, 79; GEX 8.  Because "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion," *Colorado v. Connelly*, 479 U.S. 157, 170 (1986), a necessary prerequisite to any application of the Fifth Amendment claims raised by Defendant is a showing that the CDO's to whom Defendant made his statements may appropriately considered government actors. Generally, "*Miranda* does not apply to incriminating statements made to private persons." *United States v. Romero*, 897 F.2d 47, 52 (2d Cir. 1990); *see*, *United States v. Falzarano*, 740 F. Supp. 3d 110, 117 (D. Conn. 2024)(hospital security officers do not qualify as state actors who are obligated to give *Miranda* warnings prior to custodial interrogation).  Nevertheless, because the Government has not raised the issue, the Court will assume for purposes of its analysis that CDOs at BFDF operate "under color of law" or as an agent or instrument of the government, such that they may appropriately be considered state actors subject to constitutional scrutiny. *United States v. Abney,* No. 03-CR-60 (JGK), 2003 WL 22047842, at *4 (S.D.N.Y. Aug. 29, 2003), *aff'd*, 109 F. App'x 472 (2d Cir. 2004); *see also*, *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019)("a private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity.").

becomes self-executing is the so-called "penalty situation," "where the government compels an individual to speak by threatening him with a substantial penalty for exercising his Fifth Amendment right to remain silent." *United States v. Ramos*, 685 F.3d 120, 127 (2d Cir. 2012).

In its first D&O, this Court determined—and such determination has been further confirmed by the evidence since adduced at the suppression hearing—that Defendant, prior to making any of the statements which he now seeks to suppress, was accurately advised by Lt. Kish, *inter alia*: (1) that he had the right to remain silent at all stages of the disciplinary process; (2) that his silence may be used to draw an adverse inference against him at any stage of the institution disciplinary process; and (3) that his silence alone may not be used to support a finding that he committed a prohibited act. ECF #54, pp. 6-10. Here, because the Government did not "expressly or by implication" suggest "that invocation of the privilege would lead to [disciplinary sanctions]," a classic penalty situation was not created by the warnings that Defendant was provided, and Defendant's failure to invoke his Fifth Amendment privilege may not be excused on that ground. *See*, *Minnesota v. Murphy*, 465 U.S. at 425, 438 (1984)("[I]f the State, either expressly or by implication, asserts that invocation of the privilege would lead to [disciplinary punishment], it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the [detainee]'s answers would be deemed compelled and inadmissible in a criminal prosecution."). Lt. Kish's warnings to Defendant did not expressly or impliedly suggest that invocation of the privilege would cause him to receive disciplinary sanctions, rather they merely provided

Defendant with, a "realistic reflection of the evidentiary significance of the choice to remain silent." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Standing alone, the fact that Defendant was given the choice to either tell his side of the story or have an adverse inference drawn from his silence did not amount to "unconstitutional compulsion."   *McKune v. Lile*, 536 U.S. 24, 43-44 (2002).

Accordingly, for the foregoing reasons and the reasons set forth in this Court's original decision and order, *see*, ECF #54, pp. 6-10, this Court does not accept so much of Judge Schroeder's RR&O as determined that the warnings provided by Lt. Kish *ipso facto* caused Defendant's Fifth Amendment rights to be "self-executing." *See*, ECF #75, p. 15.

### 2.  <u>Custodial Interrogation</u>

Judge Schroeder also determined that suppression was warranted because Defendant was subject to custodial interrogation without being provided with his *Miranda* warnings.  The Supreme Court has recognized that "*Miranda's* requirement of specific warnings creates a limited exception to the rule that the [Fifth Amendment] privilege must be claimed." *Roberts v. United States*, 445 U.S. 552, 560 (1980).

Initially, the Court notes that the evidence adduced at the suppression hearing establishes (and Government does not contest) that at some point during each of the three interviews of Defendant, the CDO conducting such interview asked Defendant, in some fashion, about what happened during the incident.  In each instance, Defendant responded.   Under these circumstances, the Court agrees with Judge Schroeder's determination that during each interview, Defendant was subject

to direct questioning or its functional equivalent by the CDOs.  As such, Defendant was "interrogated" by each.  *See*, *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)("We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.").  Hence, whether the statements made by Defendant during each of his three interviews with the CDOs in this case fall within the purview of *Miranda*, hinges upon the determination of whether Defendant was "in custody" at the time he was interviewed.

Indeed, a suspect is entitled to *Miranda* warnings only if he or she is interrogated while "in custody." *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). The Supreme Court has held that to determine whether an individual is "in custody" for purposes of *Miranda*, the Court must engage in "[t]wo discrete inquiries." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id*. (citations omitted).

The Court notes that that although Defendant was being held in immigration custody at the time he made his statements, that fact alone is not determinative of the "in custody" inquiry.  Clearly, "one who is imprisoned has in one obvious way been deprived of his freedom." *United States v. Willoughby*, 860 F.2d 15, 23 (2d Cir.

1988).  However, "the mere fact of imprisonment does not mean that all of a prisoner's conversations are official interrogations that must be preceded by *Miranda* warnings." *Id.*  Instead, as the Supreme Court has recognized, "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, [courts] must decide whether [the action undertaken by the law enforcement officials involved] exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights."  *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

Some Courts have determined that questioning conducted by members of the prison staff, "using the prison's routine immediate 'post-fight' procedure to ensure the safety of the general prison population," may in certain cases more closely resemble "general on-the-scene questioning" for which *Miranda* warnings are *not* required, *see*, *Miranda*, 384 U.S. at 476-77, than they do custodial interrogation. *See*, *Wilson v. Cain*, 641 F.3d 96, 104 (5th Cir. 2011); *see also*, *United States v. Conley*, 779 F.2d 970, 971 (4th Cir. 1985)(no *Miranda* warnings required where inmate questioned while handcuffed in small conference room in prison "control center," where he was awaiting transfer to the infirmary for medical treatment needed following the altercation); *Cervantes v. Walker*, 589 F.2d 424, 426-27 (9th Cir.1978)(no *Miranda* warnings required where inmate questioned in small prison library, where the inmate was awaiting a move to another cell).  On the other hand, the Supreme Court has also nevertheless required that *Miranda* warnings be given before agents of the Internal Revenue Service questioned a prison inmate, despite

12

the fact that such questioning was being done as part of "a routine tax investigation where no criminal proceedings might even be brought" by officers other than those who had put him in jail for an entirely separate offense. *Mathis v. United States*, 391 U.S. 1, 4–5 (1968).

> As the Fourth Circuit observed in *Conley*:
>
> Prisoner interrogation simply does not lend itself easily to analysis under the traditional formulations of the *Miranda* rule. A rational inmate will always accurately perceive that his ultimate freedom of movement is absolutely restrained and that he is never at liberty to leave an interview conducted by prison or other government officials. Evaluation of prisoner interrogations in traditional freedom-to-depart terms would be tantamount to a *per se* finding of "custody," a result we refuse to read into the *Mathis* decision.
>
> A different approach to the custody determination is warranted in the paradigmatic custodial prison setting where, by definition, the entire population is under restraint of free movement. The Ninth Circuit has taken the position that "restriction" is a relative concept and that, in this context, it "necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Cervantes*, 589 F.2d at 428. Thus, the court looked to the circumstances of the interrogation to determine whether the inmate was subjected to more than the usual restraint on a prisoner's liberty to depart.
>
> We agree that this approach best reconciles *Mathis* and *Miranda* in the unique context of prisons and the problems peculiar to their administration.

*Conley*, 779 F.2d at 973.  The Court finds that such rationale comports with Supreme Court and Second Circuit precedent which: require this Court to consider: (1) "the circumstances surrounding the interrogation," and, given those, whether (2) "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave," *J.D.B.*, 564 U.S. at 270; and characterize the "ultimate inquiry" as whether "'a reasonable person would have understood his freedom of

action to have been curtailed to a degree associated with formal arrest.'" *Faux*, 828 F.3d at 135 (quoting *United States v. Newton*, 369 F.3d 659, 671-672 (2d Cir. 2004)).

Since the Court is obligated to assess "the circumstances surrounding each interrogation," *see*, *J.D.B.*, 564 U.S. at 270, the Court will examine each interview separately.

### A.  The Interview By Lt. Kish

Lt. Kish, who was working as a CDO on the evening of the incident and received the complaint, immediately recognized that the incident involved a potential violation of Code Section 108 ("Assault of an Officer") of BFDF's Handbook of Prohibited Acts and that one possible sanction for such a violation was the initiation of criminal proceedings. ECF #63, pp. 60-61; GEX 1, p. 23.

Upon receiving notice of the incident, Lt. Kish went directly to the Alpha Unit 2 in which Defendant was being housed, and upon arriving, he observed Defendant "being brought out of the unit and further observed that Defendant "was definitely irate at the time" and "was placed in hard hand straits."  ECF #63, p. 18.  Roughly four to six officers were present. *Id*. Following such an incident, the BFDF's routine practice was to segregate the accused by escorting them to solitary confinement/administrative segregation in the SHU so that a disciplinary code investigation could be conducted.  *Id.*, pp. 11,19, 31, 54.  Defendant was advised that he was being placed in SHU "pending investigation for alleged code violations." *Id.*, p. 58. Defendant was not at that point advised what those code violations were. *Id*.

14

While being escorted to the SHU, Defendant "was shouting profanities regarding the incident saying that they were framing him for sexually abusing [Victim 1] and he did not do any of that." *Id*., pp. 19, 52-53.  Defendant "was swearing, mentioning the officer's name, swearing all the way down to the corridor" heading to SHU. *Id*., pp. 19, 54.  The record demonstrates that aside being advised that he was going to be placed in the SHU pending investigation of an otherwise unspecified code violation, no one working at BFDF asked Defendant any questions nor had any conversation with Defendant until he arrived at the SHU, and even then, no one spoke to Defendant until the Incident Report was completed by Victim 1, *see*, *id*., pp. 23-24, 27, 75, which was not until after Defendant was already in the SHU.  *Id*., p. 30.

Upon arriving at the SHU, Defendant, still in hard hand restraints and escorted by two officers, *id*., pp. 19-20, was taken to his cell.  *Id*., p. 20. His shoes were removed and he was placed in his cell, while still handcuffed. *Id*. The cell was about 8 feet long, by 6 or 7 feet wide, by about 8 or 8 and ½ feet high. *Id*. p., 21. Once in the cell, Defendant's handcuffs were removed though a trap in the cell door. *Id*., p. 20.  Thereafter, a "strip out" was conducted during which all of Defendant's clothes were removed, and a mouth check and anal cavity check were conducted. *Id*., pp. 20-21. Once the strip search was complete, Defendant received new clothes and new bed linens. *Id.*, p. 21.

After Defendant was situated in his cell, Lt. Kish left the SHU to assist in the completion of the Incident Report, *id*., p. 23, and once that report was complete, he returned to the SHU for purposes of "conduct[ing] the investigation." *Id.*, p. 30.  Upon

15

returning to Defendant's cell in the SHU, Lt. Kish "ask[ed] the [defendant] if he want[ed] to participate in [the] investigation." *Id*.   After Defendant indicated that he did, Defendant was handcuffed in the front "in case he want[ed] to participate in the signing of documents" and ordered to sit on his bed.  *Id*.   Thereafter, Lt. Kish and two other officers all entered Defendant's cell. *Id*., p. 32. Lt. Kish was standing approximately 5 feet from where Defendant was sitting; one of the other officers was standing to Lt. Kish's left, near the sink in Defendant's cell, approximately 5 of 6 feet away from Defendant, while the third officer was standing in front of the entrance to the cell. *Id*., p. 32.  None of the officers were armed.  *Id*.

At about 7:33 P.M. on April 30, 2023, at the outset of his encounter with Defendant inside the cell, *see*, *id.*, pp. 33-34, 39, Lt. Kish read to the Defendant, from the Incident Report, the following statement of rights related to the investigation:

> Detainee advised of the right to remain silent:  You are advised of your right to remain silent at all stages of the disciplinary process but are informed that your silence may be used to draw an adverse inference against you at any stage of the institution disciplinary process. You are also informed that your silence alone may not be used to support a finding that you have committed a prohibited act.

*Id*., pp.  36-37, 42; *see also* GEX 4.   Defendant acknowledged that he understood his rights as provided. *Id*., p. 37.  Defendant was also advised of his right to an Institution Disciplinary Panel (IDP) hearing. *Id*., pp. 37-43; *see also* GEX 5.  After reading these statements to Defendant, Lt. Kish proceeded with his investigation of Victim 1's complaint by reading to Defendant the Victim 1's statement as set forth in "Part I – Incident Report, ¶13."  GEX 4, ¶13; ECF #63, pp. 33, 45-46.

Lt. Kish then told the defendant that "he can proceed with telling [Kish] exactly his side of the story along with whatever input [the defendant] has regarding this incident." ECF #63, pp. 45-46.  Lt. Kish asked Defendant "to give me his side of the story... Tell me what happened, what happened. Just tell me the on (sic) the actual incident itself." *Id.*, p. 51.  Defendant told his side of the incident to Lt. Kish and in doing so, made admissions which are the subject of his motion to suppress. *Id.*, pp. 46-47.  Defendant's statement to Investigators in the SHU was recorded in the Investigative Report (GEX 4) at "Part III – Investigation, ¶ 27."  See, GEX 4, ¶27.

During the interview, Defendant was disruptive, and other detainees in the SHU "were yelling sexual assault, PREA, and profanities." *Id.*, p. 49.  According to Lt. Kish, during his interview of Defendant, Defendant requested a PREA form but refused to take it when Lt. Kish attempted to give it to him. *Id.*, pp. 49-50.

Upon concluding his interview with Defendant, Lt. Kish determined that the complaint made by Victim 1 was sufficient to charge the defendant with a violation of Code 108 and he referred the matter to the IDP for further proceedings.   GEX 4; ECF #63, p. 50.  Defendant waived his right to a 24-hour disciplinary hearing notice and declined a postponement of the hearing for cause. He also declined to have the assistance of "staff representation" at the hearing but did assert his right to be present at the IDP hearing. GEX 6; ECF #63, pp. 49-50.

In the immediate aftermath of the incident between Defendant and Victim 1, the Court does not doubt that the questioning of Defendant may have been undertaken by prison officials in furtherance of their legitimate interests in maintaining order in the institution, etc.  That said, however, the evidence before the

17

Court also establishes that from the very outset of the investigation, the prison officials were aware that a potential sanction for the assault violation they were investigating included referral for criminal prosecution.  This Court recognizes that "the subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." *J.D.B.*, 564 U.S. at 271.  Nevertheless, "an officer's knowledge or beliefs 'may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned,' but 'only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *Faux*, 828 F.3d at 135 (citation omitted).  Here, the swift, forceful, and certain changes experienced by Defendant in the wake of the incident clearly conveyed to Defendant that his conduct was extremely serious. The putative victim of his assault was not another detainee but one of Lt. Kish's colleagues, and prior to his questioning of Defendant, Lt. Kish had received from such victim a written statement in which she detailed her assault allegations against Defendant.  Viewed objectively, the response experienced by Defendant at the hands of the alleged victim's coworkers conveyed to him that he was not free to do anything at that point.

    Indeed, almost immediately upon Defendant being accused of the assault of the detention officer, other detention officers commenced an official disciplinary investigation of him. Within a very short time after the incident, Defendant was placed in hard hand straits and surrounded by somewhere between four and six officers. He was removed from the unit in which he was housed and taken to a cell and placed in solitary confinement in the SHU.   Before being placed in his cell, he

18

was forced to remove his footwear and clothing, he was subject to a strip search, which included both a mouth cavity search and an anal cavity search, was issued new clothes, and was, prior to being interviewed, directed once again to be re-handcuffed and ordered to sit on the bed of his cell.  Once so positioned, three detention officers entered his relatively small, 8 foot x 6 foot solitary cell.  With Defendant sitting on the bed, those three officers while inside the cell stood near Defendant. Lt. Kish stood approximately 5 feet from where Defendant was sitting, while one of the other officers stood to Lt. Kish's left, near the sink in Defendant's cell, approximately 5 of 6 feet away from Defendant, and the third officer stood in front of the cell door, the sole means of ingress and egress to the cell. *Id.*, p. 32. Prior to questioning, Defendant was confronted with the accusation of his accuser, another prison official.  After being so confronted, Lt. Kish requested Defendant, "to give me his side of the story... Tell me what happened, what happened. Just tell me the on (sic) the actual incident itself." *Id.*, p. 51.

Under these circumstances, the Court easily concludes that "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.' " *Faux*, 828 F.3d at 135 (quoting *Newton*, 369 F.3d at 671-672).  Although this Court acknowledges that "[t]aking a prisoner aside for questioning—as opposed to questioning the prisoner in the presence of fellow inmates—does not necessarily convert a noncustodial situation ... to one in which *Miranda* applies[,]" *Howes v. Fields*, 565 U.S. at 512, that is not all that happened here.  Rather, Defendant, who was being held in custody on a civil immigration detainer, was placed in handcuffs and forcibly taken to solitary confinement, where

19

he was subject to a strip search and body cavity search, and eventually, while handcuffed and seated on his bed, subject to questioning by three prison officials who had entered his cell and stood over and in close proximity to him, as he was questioned in an extremely small cell. Thus, his freedom of movement was significantly more restricted than it would normally be in the usual immigration detention environment. A reasonable person would not have thought he was free to leave the cell in which he was questioned, and a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. *See*, *FNU LNU*, 653 F.3d at 153. In short, this Court determines that the circumstances under which the Defendant was questioned created "that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

While there is no indication that Lt. Kish's interview of Defendant was prolonged, it occurred, as already noted, in a small cell to which Defendant had just been moved, which was located some distance from the location at which he had previously been housed. The SHU itself was much more restrictive than the Unit in which Defendant previously resided. He did not volunteer for such interview as the record demonstrates that he was irate and had been escorted there, in handcuffs, by at least two officers. Once at the cell, he was strip-searched and highly invasive body cavity searches of his mouth and anus were conducted. He was issued new clothes. While no weapons were displayed, the interview took place inside an extremely small (8 foot by 6 foot) cell, which was occupied by four adult males (Defendant and 3 officers). Defendant was forced to sit in handcuffs on his bed,

20

while the other officers stood over him and essentially surrounded him, blocking his access to the cell's door. Defendant was advised that he was being investigated and was never told that he was free to leave or to end the interview.

In view of all the foregoing objective circumstances surrounding Lt. Kish's initial interview of Defendant, this Court determines that a reasonable person in Defendant's situation would have understood his freedom of action to be curtailed to a degree associated with formal arrest. *See, Faux*, 828 F.3d at 135.  Accordingly, this Court agrees with Judge Schroeder's conclusion that Defendant was "in custody" for *Miranda* purposes, and since he was subject to interrogation without being provided with his *Miranda* warnings, his statements to Lt. Kish will be suppressed.

### B.  The Interview By Lt. Ange

On the morning after the interview by Lt. Kish, Defendant, at approximately 10:45 AM, on May 1, 2023, was escorted from his in cell in the SHU to a "processing office"  so that he could be interviewed by Lt. Ange in conjunction with a PREA investigation, for which Defendant would have been considered the putative victim. Defendant was escorted from the SHU cell in which he was being held to a processing office to complete a SAAPI assessment. GEX 8, p. 2; ECF #63, p. 117.

Lt. Ange testified that as part of that PREA investigation the BFDF used a SAAPI assessment worksheet as part of the "interview process by which [the BFDF] ensure[s] that [they] vet…anybody that is making a claim [that they were assaulted]." ECF #63, p. 117.  The purpose of the PREA is "to report either staff on detainee or

21

detainee on detainee allegations of sexual misconduct. *Id.*, pp. 93, 123. The record fails to disclose any of the particulars of Lt. Ange's interaction with Defendant.

Specifically, the record does not disclose how Defendant arrived at the processing office from the SHU.[5]  Although Lt. Ange testified at the suppression hearing and described the routine process he generally follows when conducting a PREA investigation, *id.*, pp. 117-118, he provided little to no testimony regarding the specific circumstances of his interaction with Defendant.  In that regard, he provided no testimony regarding: the physical layout of the processing office where the interview apparently took place; who was present for such interview; how long the interview took; whether, in fact, Defendant volunteered for the interview; whether Defendant was restrained during the interview; whether Defendant was told he was free to leave; what, if anything, he told Defendant; or the language and tone he used during his interview of Defendant.  Indeed, the lack of evidence presented by the Government at the suppression hearing regarding the actual circumstances of Lt. Ange's interaction with Defendant was remarkable.

As noted by Judge Schroeder:

> The testimony of Lieutenant Ange was very brief (only direct examination by the government; no cross-examination by the defense). *See* Dkt. #68-1, pp. 117-120. His testimony consisted basically of confirming the contents set forth in his email to Captain Flores dated May 1, 2023. *See* Government Exhibit 8. Nowhere in his testimony nor in his email to Captain Flores did Lieutenant Ange indicate that he rendered any type of advice of rights to the defendant prior to his interview of the defendant. His email to Captain Flores of May 1, 2023

---

[5] While Lt. Ange testified that standard practice was for individuals with whom he sought to conduct a SAAPI interview typically to be brought to and from such office by other officers while in handcuffs, *see*, *Id.*, p. 119, he provided no testimony regarding how Defendant got there in this case.

(Government Exhibit 8) is basically a summary by Lieutenant Ange of what the defendant stated to him when questioned.

ECF #75, p. 20.

The Second Circuit has not definitively resolved which party bears the burden of establishing that an individual is (or is not) in custody for purposes of Miranda. *See*, *United States v. Beal*, 730 F. App'x 30, 33 n.2 (2d Cir. 2018); *United States v. Simmonds*, 641 F. App'x 99, 102 (2d Cir. 2016).  Here, the dearth of evidence regarding the circumstances of Defendant's PREA interview makes the custody determination especially challenging.  The fact that the interview is directed to the Defendant as a putative victim of a sexual assault suggests that the level of coercion involved in any such interview would be markedly reduced from the two other interviews which occurred in this case in which Defendant was being interviewed as a possible perpetrator (rather than victim) of a sexual assault.  Also, the fact that the interview was apparently conducted in Lt. Ange's office as opposed to the cell in the SHU in which Defendant was being held further supports a finding that Defendant was not in custody. The problem, however, is that the evidence before this Court fails to address the most relevant factors that the Court is obligated to consider in making its custody determination.  Put simply, the circumstances under which Lt. Ange's interview of Defendant was conducted have not been established and remain largely unknown.

The record generally demonstrates that Defendant made his statement to Lt. Ange without receiving *Miranda* warnings while he was in custody as an immigration detainee.  With Defendant having established that he was generally in custody at the

time of his interaction with Lt. Ange and this Court having concluded that he was previously subject to a custodial interrogation without being advised of his *Miranda* warnings the evening before, this Court determines that the Government was obligated to come forward with some evidence to persuade the Court that Defendant's statement to Lt. Ange was voluntarily made. *Lego v. Twomey*, 404 U.S. 477, 489 (1972)("when a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered. Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); *see also*, *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990) ("[Fifth Amendment] rights can be waived, with the burden on the government to prove by a preponderance of evidence that any waiver was knowing and intelligent.").

The Court suspects that overall circumstances of Lt. Ange's interview of Defendant may well have been significantly different from those conducted by Lt. Kish the prior evening (and those conducted by Capt. Flores later that day). The Court further imagines that there were likely facts which could have presented which might well have supported the view that the circumstances of Lt. Ange's interview was non-custodial such that Defendant's failure to assert his Fifth Amendment privilege brought it "outside the context of the inherently coercive custodial interrogations for which [*Miranda*] was designed." *See, Roberts v. United States*, 445 U.S. at 560. The problem is that despite being given the opportunity to do so, the Government never presented such evidence at the hearing through the hearing

24

of Lt. Ange or any other witness.  Layered over that is the fact that the evidence that was presented clearly demonstrated that the CDO conducting the PREA investigation was in direct communication with the CDO conducting the IDP and that the PREA interview was conducted in coordination with the investigatory and disciplinary investigations of Defendant which were being conducted contemporaneously.  Where a finding has been made that a defendant's "initial statement was obtained in violation of the defendant's *Miranda* rights," "[t]he prosecution bears the burden of disproving by a preponderance of the evidence that the government employed a deliberate two-step strategy to deprive the defendant of the protections afforded by the Fifth Amendment." *United States v. Moore*, 670 F.3d 222, 229–30 (2d Cir. 2012).  Here, the PREA interview was sandwiched between the investigatory and disciplinary interviews.  Such coordination and timing further detract from any view that the disciplinary interviews and the PREA interviews were entirely distinct and independent from one another.

Because of the dearth of evidence presented at the suppression hearing to establish the circumstances under which the Defendant was interviewed by Lt. Ange, this Court cannot conclude that Defendant, who was otherwise incarcerated, was not "in custody" when he spoke with Lt. Ange.  For that reason, and because the record demonstrates that he was subject to a second interrogation without being provided with his *Miranda* warnings, this Court adopts Judge Schroeder's recommendation that Defendant's statements to Lt. Ange will be suppressed.

### C.  The Interview By Capt. Flores

After his late-morning interview with Lt. Ange on May 1, 2023, Defendant was returned to his cell in the SHU. By about 1:20 PM that same day, *see*, GEX, ¶24, he was once more handcuffed, seated on his bed, and interviewed by three officers—this time, by Capt. Flores and two other members of the IDP—who all stood inside his cell.  The circumstances of the IDP interview were nearly identical to the investigatory interview conducted by Lt. Kish the previous evening. While the Government maintains that Defendant's statements to Capt. Flores and the IDP members "was not a police-dominated atmosphere and [] Defendant was not compelled to provide a statement," *id.*, p. 16, this Court disagrees and concludes that Defendant's statements to Capt. Flores must also be suppressed.

The IDP Hearing was conducted by Capt. Flores along with two other BFDF staff members. *Id.*, pp. 83-85. The hearing amounted to the three IDP members initially reviewing the "incident report, any additional memos, any video if there is a video of the incident, [and] witness statements." *Id.*, p. 81. The IDP members conducted their review prior to going to the SHU in which Defendant was being held. *Id.*, pp. 83-86. After reviewing all the materials, the IDP members eventually went to the SHU because Defendant requested to be present at his disciplinary hearing. *Id.*; *see*, GEX 6.  When the IDP arrived at the SHU, Defendant, because he was charged with assault of staff, was placed on a "hand restraint restriction," was handcuffed in the back, and was commanded to sit on his bed.  *Id.*, pp. 86-87, 98-99.  Once Defendant was handcuffed and seated on his bed, Capt. Flores and two

26

other officers (who collectively constituted the IDP) entered Defendant's cell and advised Defendant that they were there to conduct the IDP hearing. *Id.*, pp. 88-91.

With the other two officers in the cell, Capt. Flores read the Incident Report (GEX 4) to Defendant to further inform Defendant of the charge against him and why they were there. *Id.*, p. 89. After doing so, Capt. Flores, without any warning whatsoever to Defendant regarding his rights, *see*, *id.*, p. 91, asked Defendant if there was anything more that he wanted to add. *Id.*. pp. 89-90.  In response, Defendant stated, "We both touched each other. She verbally told me, since I am the only one going outside, she was going to touch my dick." *Id.*, p. 90.  Nothing more was said.  Defendant's statement to the IDP in the SHU was recorded in the Investigative Report (GEX 4) at "Part II -Institution Disciplinary Panel (IDP), ¶ 20." *See* GEX 4, ¶ 20; ECF #63, pp. 89-90.

Since Defendant "admitted to groping the officer [Victim 1] and there was nothing more to add, *see*, *id.*, p. 91, the IDP determined that Defendant violated Code 108 and recommended a variety of administrative disciplinary sanctions. GEX 4,  ¶¶ 21A, 22, 23, 31. The IDP further recommended "60 days (sixty) days disciplinary segregation and [the] initiat[ion] criminal proceedings." GEX 4, ¶ 23; *see*, ECF #63, pp. 111-112.  According to the incident report, the IDP recommended the foregoing punishments at 1:20 PM on May 30, 2023, *see*, GEX 4, ¶24, and such punishment was reviewed and concurred with by the Officer-in-Charge at 2:35 PM that day. GEX 4, ¶ 31.

This Court determines that the IDP interview by Capt. Flores was materially no different than that conducted the previous evening by Lt. Kish. In both instances,

27

Defendant was handcuffed and ordered to sit on his bed while three officers entered his cell and stood there while he answered their question. Once again, this Court determines that a reasonable person in Defendant's situation would have understood his freedom of action to be curtailed to a degree associated with formal arrest, *see*, *Faux*, 828 F.3d at 135, and agrees with Judge Schroeder's conclusion that Defendant was "in custody" for *Miranda* purposes.  Since he was subject to custodial interrogation without being provided with his *Miranda* warnings, his statements to Capt. Flores will be suppressed.

**CONCLUSION**

Accordingly, for the foregoing reasons, this Court adopts Judge Shroeder's findings of facts and so much of his RR&O as recommended that Defendant's motion to suppress (ECF #38) his statements to Lt. Kish, Lt. Ange, and Capt. Flores, should be **GRANTED**. Defendant's statements to Lt. Kish, Lt. Ange, and Capt. Flores are **SUPPRESSED**. The parties are directed to appear before this Court on May 29, 2026, at 9:00 AM. for purposes of setting a trial date.

**IT IS SO ORDERED.**

*s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:   May 4, 2026
        Buffalo, New York

28